# REPORTS OF CASES

## DETERMINED IN

# THE SUPREME COURT,

## JULY TERM, 1861.

---

### BRUMAGIM et al. v. TILLINGHAST.

THE Act of the Legislature of April, 1858, amending the Act of April, 1857, "to provide revenue for the support of the government of this State from a tax to be levied and collected from foreign and inland bills and other matters," so far as it imposes a tax upon bills of lading for the transportation of gold or silver from any point in this State to any point without the State, is in conflict with that clause of the Constitution of the United States which declares that "No State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws;" and hence the provisions of the original Act of 1857 for enforcing the stamp tax must be restricted in their application to other instruments than such bills of lading.

Money paid by plaintiffs to the Treasurer of the City and County of San Francisco to purchase stamps under the Act of 1857, as amended by the Act of 1858, to put on bills of lading for the transportation of gold or silver by steamer from that city to New York, is money voluntarily paid and cannot be recovered back. As the Act of 1857, as amended, required stamps to be deposited with the Treasurer for sale, and as he had no authority to compel plaintiffs to purchase them, the fact that the owners and agents of the steamers refused to issue bills of lading without the stamps does not show any coercion on the part of the Treasurer. The conduct of third parties cannot be resorted to for the purpose of fastening a liability upon him. Unless he personally does some act which the law condemns, he cannot be charged, no matter how arbitrarily or improperly others have acted.

Money voluntarily paid upon a claim of right, with full knowledge of all the facts, cannot be recovered back merely because the party at the time of payment

was ignorant of or mistook the law as to his liability. The illegality of the demand paid constitutes of itself no ground for relief. There must be in addition some compulsion or coercion attending its assertion, which controls the conduct of the party making the payment.

Generally to constitute such compulsion or coercion as to render the payment involuntary, there must be some actual or threatened exercise of power possessed, or supposed to be possessed, by the party exacting or receiving the payment, over the person or property of the party making the payment, from which the latter has no other means of immediate relief than by advancing the money.

The fact that a party pays money under protest does not change the character of the transaction or enable him to recover it back, unless the payment was under duress or coercion, or where undue advantage was taken of his situation.

The object of a protest in such cases is to take from the payment its voluntary character, and thus conserve to the party a right of action to recover back the money. But where no such compulsion exists, or no advantage is taken, there is no case for its interposition. If the payment is in truth voluntary, no language used on the occasion can change its character.

The proposition that "moneys voluntarily paid upon a claim of right, with full knowledge of the facts, cannot be recovered back," has expections.—COPE, J.

APPEAL from the Twelfth District.

The facts are sufficiently stated in the opinion of the Court. Defendant filed a general demurrer, which the Court below sustained and gave final judgment in his favor. Plaintiffs appeal.

*Crockett & Crittenden*, for Appellants.

I. The Act of April 29th, 1858, amendatory of the Act of April, 1857, " to provide a revenue for the support of the government of this State from a tax to be levied and collected from foreign and inland bills and other matters," is in conflict with the tenth section of article one of the Constitution of the United States, which declares that " No State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws," so far as that act imposes a stamp tax upon bills of lading for the transportation of gold or silver or gold dust from any point in this State to any point without the State. (*Almy* v. *The People of the State of California*, decided by the United States Supreme Court, December Term, 1860; *Passenger cases*, 7 How.; *People* v. *Downer*, 7 Cal. 169.)

II. The payments by plaintiffs to defendant were compulsory and

Brumagim *v.* Tillinghast.

therefore may be recovered back. (*Norris* v. *City of Boston*, 7 How. 285; *Elliott* v. *Swartwout*, 10 Pet. 137; *Hays* v. *Pacific Mail S. S. Co.*, 17 How. 597; *Ripley* v. *Gelston*, 9 Johns. 201; *Clinton* v. *Strong*, Id. 370; *Bates* v. *N. Y. Ins. Co.*, 3 Johns. Cases, 463; *Chase* v. *Taylor*, 4 Harr. & J. 54; 4 Met. 246; *Joiner* v. *School Dist.*, 3 Cush. 567; *Boston & Sandwich Glass Co.* v. *Boston*, 4 Met. 181; *Corties* v. *Waddell*, 1 Barb. 355; *Alston* v. *Durant*, 2 Strobh. 257; *Parker* v. *Bristol & Ex. R. Co.*, 7 Eng. L. & E. 528; *Maxwell* v. *Griswold*, 10 How. 242; *Sartwell* v. *Horton*, 2 Wms. [Vt.] 370.)

*C. Temple Emmet*, for Respondent.

I. The payments by plaintiffs to defendant were voluntary and cannot be recovered back. There was no duress or coercion. The stamps were bought voluntarily, and might have been used for the admittedly constitutional purposes of the Act of 1858. The coercion alleged to spring from the refusal of the agents of the steamers to sign unstamped bills of lading cannot subject the defendant to an action. He can only be liable to an action when the coercion proceeds from himself.

II. The fact that the payments were made under protest did not alter their character and make them compulsory. (*Forbes* v. *Appleton*, 5 Cush. 115; *Benson* v. *Monroe*, 7 Id. 125; *Potter* v. *Bemiss*, 1 Johns. 515; *Sprague* v. *Birdsall*, 2 Cow. 419; *Krubbs* v. *Hall*, 1 Espinasse, 84; *Brown* v. *McKinnally*, Id. 279; *Fleetwood* v. *City of N. Y.*, 2 Sandf. S. C. 475; *McMillan* v. *Richards*, 9 Cal. 365.)

FIELD, C. J. delivered the opinion of the Court—BALDWIN, J. and COPE, J. concurring.

The Act of the Legislature of April, 1858, amendatory of the Act of April, 1857, "to provide revenue for the support of the government of this State, from a tax to be levied and collected from foreign and inland bills, and other matters," imposes upon certain written instruments, and among others upon bills of lading for the transportation of gold or silver coin, gold dust, or gold or silver in bars, or other form, from any point or place in this State to any

point or place without the State, a stamp tax of thirty cents on the first one hundred dollars of the value of the property transported, and of one-fifth of one per cent. upon the amount of its valuation exceeding that sum, and requires that there shall be attached to each bill of lading, or stamped thereon, a stamp or stamps expressing in value the amount of such tax.   The original Act of 1857 constitutes the Governor, Treasurer and Secretary of State, Commissioners of Stamp Duties, and in substance provides that they shall cause stamped paper or stamps corresponding with the several rates of duties prescribed by the act, to be prepared and delivered to the Controller, to be by him distributed to the several County Treasurers for sale.   The original act also declares all contracts or instruments of writing executed after the first of July, 1857, charged with the payment of a stamp tax, absolutely void unless stamped or marked as prescribed therein, and makes the issuance of any such instruments without the stamp a misdemeanor punishable by fine. The plaintiffs are bankers, engaged in the regular course of their business, in shipping gold and silver coin, gold and silver in bars, and gold dust from the port of San Francisco, in this State, to the port of New York, in the State of New York, and to foreign ports; and the present action is brought to recover $2,031 alleged to have been paid by them to the defendant, who was Treasurer of the city and county of San Francisco, in the purchase of stamps to be affixed to bills of lading taken upon shipments made by them from the port of San Francisco to the port of New York.

Two questions are presented for determination by the demurrer: 1st, whether the Act of 1858, referred to, so far as it imposes a stamp tax upon the bills of lading mentioned, is in conflict with the Constitution of the United States; and 2d, if the act is held to be in conflict with the Constitution of the United States, whether upon the facts stated in the complaint the plaintiffs are entitled to recover from the defendant the amounts paid by them.

1. Upon the first question presented we have the decision of the Supreme Court of the United States, rendered since the appeal in the present case has been pending. In *Almy* v. *The People of the State of California*, decided at the December term, the constitutionality of the act of this State was considered—indeed, consti-

tuted the sole question before that Court.   The case was this, as stated in the opinion of Mr. Chief Justice Taney : Almy, as master of a ship lying in the port of San Francisco and bound to New York, received a quantity of gold dust for transportation to New York, for which he signed a bill of lading upon unstamped paper, and without having any stamp attached to it.   For this violation of the law of this State, he was indicted in the Court of Sessions for a misdemeanor, and at the trial the jury found a special verdict, setting forth the facts as above stated.   Upon the return of the verdict, the counsel of Almy moved for judgment of acquittal, upon the ground that the law was repugnant to the Constitution of the United States ; but the Court decided that the law was not thus repugnant, and adjudged that Almy should pay a fine of one hundred dollars for this offense.   The case was taken by writ of error to the Supreme Court of the United States, and the judgment was there reversed ; the Court holding that the tax in question was a duty upon the export of gold and silver, and consequently repugnant to that clause of the tenth section of Art. I, of the Constitution of the United States, which declares that " No State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws."   After observing that if the tax was laid on the gold and silver exported, every one would see that it was repugnant to the clause cited, the Chief Justice says : " But a tax or duty on a bill of lading, although differing in form from a duty on the article shipped, is in substance the same thing ; for a bill of lading, or some written instrument of the same import, is necessarily always associated with every shipment of articles of commerce from the ports of one country to those of another.   The necessities of commerce require it.   And it is hardly less necessary to the existence of such commerce, than casks to cover tobacco, or bagging to cover cotton, when such articles are exported to a foreign country ; for no one would put his property in the hands of a shipmaster without taking written evidence of its receipt on board the vessel, and the purpose for which it was placed in his hands. The merchant could not send an agent with every vessel to inform the consignee of the cargo what articles he had shipped, and prove

the contract of the master if he failed to deliver them in safety. A bill of lading, therefore, or some equivalent instrument of writing, is invariably associated with every cargo of merchandise exported to a foreign country; and, consequently, a duty upon that is, in substance and effect, a duty on the article exported. And if the law of California is constitutional, then every cargo of every description exported from the United States may be made to pay an export duty to the State, provided the tax is imposed in the form of a bill of lading, and this in direct opposition to the plain and express prohibition in the Constitution of the United States. In the case now before the Court, the intention to tax the export of gold and silver, in the form of a tax on the bill of lading, is too plain to be mistaken. The duty is imposed only upon bills of lading of gold and silver, and not upon articles of any other description. And we think it impossible to assign a reason for imposing the duty upon the one and not upon the other, unless it was intended to lay a tax on the gold and silver exported, while all other articles were exempted from the charge. If it was intended merely as a stamp duty on a particular description of paper, the bill of lading of any other cargo is in the same form, and executed in the same manner and for the same purposes, as one for gold and silver, and, so far as the instrument of writing was concerned, there could hardly be reason for taxing one and not the other."

This decision of the Supreme Court is conclusive upon us, and we therefore hold in accordance with it, that the Act of April, 1858, so far as it imposes a tax upon bills of lading for the transportation of gold and silver from any point in this State to any point without the State, is unconstitutional and void. And, as a matter of course, the provisions of the original Act of 1857, for the enforcement of the stamp tax, must be restricted in their application to other instruments than such bills of lading.

2. The solution of the second question presented depends upon the character of the payments—whether they were voluntary, or made under compulsion or coercion. Notwithstanding some doubts suggested in the early cases on the subject, the rule is at this day well settled that moneys voluntarily paid upon a claim of right, with full knowledge of all the facts, cannot be recovered back

merely because the party at the time of payment was ignorant of or mistook the law as to his liability. The illegality of the demand paid constitutes of itself no ground for relief. There must be, in addition, some compulsion or coercion attending its assertion, which controls the conduct of the party making the payment. It is the compulsion or coercion under which the party is supposed to act which gives him a right to relief. If he voluntarily pay an illegal demand, knowing it to be illegal, he is of course entitled to no consideration ; and if he voluntarily pay such demand in ignorance or misapprehension of the law respecting its validity, he is in no better position, for it would be against the highest policy to permit transactions to be opened upon grounds of this character. " Every man," as said Lord Ellenborough in *Bilbie* v. *Lumley*, (2 East. 472) " must be taken to be cognizant of the law ; otherwise, there is no saying to what extent the excuse of ignorance might be carried. It would be urged in almost every case." · (*Fullam* v. *Down*, 6 Esp. 26 ; *Brisbane* v. *Dacres*, 5 Taunt. 144.) Relief against mistakes in law is refused upon the principle, said the Supreme Court of New York in *Clarke* v. *Dutcher*, (9 Cowen, 674) " that in judgment of law *there is no mistake*, every man being held, for the wisest reason, to be cognizant of the law. The act, therefore, against which the party seeks relief is his own voluntary act, and he must abide by it." In that case, it was held, after an elaborate examination of the English authorities, that where money is paid with a full knowledge of the facts and circumstances upon which it is demanded, or with the means of such knowledge, it cannot be recovered back upon the ground that the party supposed he was bound in law to pay it, when in truth he was not. " He shall not be permitted," said the Court, " to allege his ignorance of law ; and it shall be considered a voluntary payment." (See also, *Preston* v. *Boston*, 12 Pick. 7 ; *Boston and Sandwich Glass Co.* v. *City of. Boston*, 4 Met. 189 ; *Forbes* v. *Appleton*, 5 Cush. 117 ; *Benson* v. *Monroe*, 7 Cush. 125 ; *Chase* v. *Dwinal*, 7 Greenl. 134 ; *Smith* v. *Inhabitants of Readfield*, 27 Me. 145 ; *Mays* v. *Cincinnati*, 1 Ohio State, 268 ; *Mayor, etc., of Baltimore* v. *Lefferman*, 4 Gill. 425 ; *Robinson* v. *City Council of Charleston*, 2 Richardson, 317 ; *Mowatt et al.* v. *Wright*, 1 Wend. 355 ; *Wy-*

*man* v. *Farnsworth*, 3 Barb. 370; and *Elliott* v. *Sartwout*, 10 Pet. 138.)

What shall constitute the compulsion or coercion which the law will recognize as sufficient to render payments involuntary, may often be a question of difficulty. It may be said in general that there must be some actual or threatened exercise of power possessed, or supposed to be possessed, by the party exacting or receiving the payment over the person or property of the party making the payment, from which the latter has no other means of immediate relief than by advancing the money. In *Forbes* v. *Appleton*, (5 Cush. 117) a payment of money was made in order to prevent the obligee in a bottomry bond from attempting to enforce the same by taking possession of the vessel, and the Court held that it was not a compulsory but a voluntary payment, and if the money was not due, the debtor had no right of action to recover it back, although he declared at the time of payment that he made it under coercion, and intended to reclaim the same by action. "The principle of law," said the Court, "is a very familiar and a very salutary one, that, where a person, with full knowledge of all the circumstances, pays money voluntarily under a claim of right, he shall not afterwards recover back the money so paid. To avoid the application of the rule in the present case, it must appear that the plaintiff was compelled, by duress of his person or goods, to pay the same. In general, the cases that have been treated as exceptions are cases where the possession of the property upon which the lien was claimed was already in the party demanding the money, or cases in which the party had no other means to save himself from imprisonment, or his property from sale, on execution or warrant of distress, but by paying the money demanded." In the case of the *Mayor and City Council of Baltimore* v. *Jefferman*, (4 Gill, 425) the Court of Appeals of Maryland concludes an examination of numerous authorities on the subject of compulsory payments, by stating that it considers "the doctrine as established, that a payment is not to be regarded as compulsory, unless made to emancipate the person or property from an actual and existing duress, imposed upon it *by the party to whom the money is paid.*" And in *Mays* v. *Cincinnati*, (1 Ohio Rep. 268) the Supreme Court of

Brumagim *v.* Tillinghast.

Ohio concludes a like examination by observing, that " this unbroken chain of authority seems to warrant the conclusion that a payment of money upon an illegal or unjust demand, when the party is advised of all the facts, can only be considered involuntary when it is made to procure the release of the person or property of the party from detention, or when the other party is armed with apparent authority to seize upon either, and the payment is made to prevent it."

Tested by these authorities, the question presented is one of easy solution.    The complaint does not show that the payments to the defendant for the stamps were the result of any coercion on his part.    It only alleges that in the ordinary course of trade, shipments of gold and silver to New York were made by lines of ocean steamers plying between San Francisco and Panama, and connecting with lines of steamers plying between Aspinwall and New York ; that they afforded the only safe and speedy means by which such shipments could be made ; that the owners, agents and masters of those lines refused to issue bills of lading, unless the same were first stamped, in pursuance of the Act of 1858 ; that in order to procure bills of lading for the shipments made by them, the plaintiffs were forced to apply to the defendant, as County Treasurer, for the purchase of the requisite stamps to be affixed to the bills, and did purchase the same from him at the prices designated in the Act, which he demanded ; that they protested at the time against the right of the defendant to exact payment for the stamps, and against the acts of the Legislature as unconstitutional and void, and gave notice that they would hold him responsible for the moneys paid.    No facts are here stated, showing any compulsion or coercion by the defendant.    The only compulsion or coercion, in fact, alleged, comes from another source—from the masters, agents and owners of the steamers, from their refusal to issue the bills of lading unless previously stamped.    But this conduct of third parties cannot be resorted to for the purpose of fastening liability upon the defendant.    Unless he has personally done some act which the law condemns, he cannot be charged, no matter how arbitrarily or improperly others may have acted.    Suppose the owners or agents of the steamers had refused to issue the bills of lading required

until the plaintiffs made purchases of other articles than stamps, or bestowed certain bounties, and they had complied with these conditions, no one would pretend that an action could subsequently be maintained by the plaintiffs against the vendors in the one case, or the recipients of the bounties in the other, to recover back the money with which they had parted. But the case supposed and the case at bar are not materially different. The refusal to issue the bills of lading might as well have been placed on the one ground as the other. The existence of the Act of 1858, it is true, induced the conduct of the agents and owners of the steamers, but the justification of their conduct falls with the constitutionality of the Act. That conduct, as we have observed, could not affect the action of the defendant. He was entrusted with a certain quantity of stamps, and authorized to dispose of them to applicants at a fixed price. If the price were paid he delivered the stamps, but if not paid he retained them in his possession. The plaintiffs were at liberty, so far as he was concerned, to purchase or decline purchasing. He was not invested with power to compel them to purchase, nor to punish them if they chose to refrain from purchasing. Nor was he in possession of any of their property the delivery of which they could not obtain without such payment. Under these circumstances, the payments made by them were, in the eye of the law, voluntary payments. They were acquainted with all the facts, and the case was not one which admitted of false representations as to the position or power of the defendant. The gist of the whole matter, as alleged by the plaintiffs, is simply this : They doubted as to the constitutionality of the Act of the Legislature, and therefore voluntarily purchased the stamps, preferring this course, as one of convenience, to taking proceedings against the owners or agents of the vessels who refused the bills of lading unless stamped. The protest accompanying the purchase and payment of the money did not change the character of the transaction. A protest is available, as we said in *McMillan* v. *Richards*, (9 Cal. 417) only in cases of payment under duress or coercion, or where undue advantage is taken of one's situation. In such cases its object is to take from the payment its voluntary character, and thus conserve to the party a right of action to recover back the

money.   But where no such compulsion exists, or advantage is taken, there is no case for its interposition, and the character of the payment is unaffected by it.   (*Fleetwood* v. *The City of New York*, 4 Sandf. 476.)   If the payment were in truth voluntary, no language used on the occasion would change its character.

Judgment affirmed.

BALDWIN, J.—I concur in the opinion of the Chief Justice.   I think that the facts of this case bring the question within the general proposition laid down, and that proposition, as limited and explained by the facts and the entire reasoning of the opinion—as all general propositions must be—is not too broadly stated.

COPE, J.—I concur in the judgment of affirmance, and generally in the views expressed in the opinion of the Chief Justice.   I think the proposition that " moneys voluntarily paid, upon a claim of right, with full knowledge of the facts, cannot be recovered back," too broadly stated.   There are, in my judgment, exceptions to that rule, but I do not regard the present case as falling within them.